# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JERMAINE PULLOM and JOHN TIMOTHY WALDREP,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) ) | Civil Action Number **2:15-cv-02081-AKK** |
| **GREATER BIRMINGHAM TRANSPORTATION SERVICES, L.L.C. d/b/a YELLOW CAB and KEITH VAN PETTY,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Jermaine Pullom and John Timothy Waldrep allege multiple claims against their former employer, Greater Birmingham Transportation Services, L.L.C. d/b/a Yellow Cab ("GBTS").  Specifically, Pullom asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 for race-based harassment (Counts I and III) and retaliation (Counts II and IV), Title VII claims for sexual harassment and retaliation (Counts V and VI), and a state law claim for negligent and wanton supervision, training, and retention (Count IX), against GBTS.  Waldrep asserts a Title VII retaliation claim for opposing sexual harassment against GBTS (Count X), and state law claims for assault and battery against GBTS and Keith Van Petty, his former supervisor (Count XIII), and negligent and wanton supervision, training, and retention against GBTS (Count

XIV).[1]

Presently before the court are defendants' motion for summary judgment, doc. 27, and plaintiffs' motion for partial summary judgment, doc. 28.[2] The motions are fully briefed, docs. 27; 29; 34; 36; 37; 38; 39; 40, and ripe for review. For the reasons stated below, plaintiffs' partial motion is due to be granted, and, except for Pullom's sex harassment claim (Count V), and Waldrep's retaliation claim against GBTS (Count X) and assault and battery claim against Van Petty (Count XIII), defendants' motion is due to be granted.

## I.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the

---

[1] Pursuant to plaintiffs' notice to the court that they withdraw their state law claims for invasion of privacy and outrage (Counts VII, VIII, XI, and XII), *see* doc. 34 at 41 n.22, these claims are **DISMISSED WITH PREJUDICE**.

[2] Plaintiffs' motion for leave to file excess pages, doc. 33, is **GRANTED**.

absence of a genuine dispute of material fact. *Id.* at 323. The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal citations and quotation marks omitted). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 244 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual dispute will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *But see Pace v. Capobianco*, 238 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could

reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND

### A. Pullom

Pullom, who is male and African-American, worked for GBTS as a porter. Doc. 27-3 at 10. During Pullom's employment, Van Petty, Pullom's immediate supervisor, allegedly made sexual advances toward Pullom "[n]umerous" times, beginning "shortly after [Pullom] started working there" in May 2012. *Id.* at 11–12. The first incident occurred during a work trip, when Van Petty purportedly asked Pullom if he wanted to "take a walk on the wild side." *Id.* at 13. The second incident occurred when Pullom was "bent over in a car helping one of the mechanics," and Pullom's "pants [were] down," and Van Petty "told [Pullom] to pull [his] pants up before [Van Petty] [stuck] something back there." *Id.* at 14. On another occasion, when Van Petty encountered Pullom in the restroom, Van Petty told Pullom to quit "jacking off" and asked if Pullom "need[ed] some help with it." *Id.* Van Petty also twice remarked to Pullom, in June and October of 2013, that Pullom "would not know if [Van Petty] was a man or a woman" if Van Petty "took

his dentures out." *Id.* at 17–18. Pullom did not report these comments to anyone in management, except perhaps Susan Whiddon and Mark Little.[3]

Van Petty also made race-based remarks. For example, Pullom heard Van Petty state that "he's never done a black guy but he'll do a light skinned guy." *Id.* at 15. Moreover, when Pullom rode in the car with Van Petty, "if [Van Petty] [was] driving behind a black female and [she] [was] not driving fast enough, [Van Petty] [would] refer to [her] as a nappy-headed hoe or a nappy-headed bitch." *Id.* at 19–20. Additionally, on occasions when Pullom and Van Petty drove together to predominantly African-American neighborhoods to repossess taxi cabs, Van Petty would tell Pullom, "let[']s go down here where your people at, you're better to deal with your people down here in the hood." *Id.* at 21. Finally, after Pullom assisted Paige Coker, GBTS's Vice President, with some personal tasks, Van Petty referred to Pullom as Coker's "house nigger." *Id.*

---

[3] Pullom testified that "Susan Woodward [*sic*] was part of management," doc. 27-3 at 12, but Paige Coker testified that she "wouldn't have categorized [Susan] as a supervisor that could have . . . addressed this," doc. 30-8 at 18. Similarly, although Pullom testified that "at the time [of his discharge] Mark Little was the shop supervisor . . . .," doc. 27-3 at 22, Little testified that he "wasn't shop manager when Mr. Pullom was there," doc. 30-11 at 12.

Pullom also reported the comments to Tammy Phillips and Jeff Johnson (Pullom does not describe their positions in his deposition) and Debbie Davis (whom Pullom described as "basically a coworker" who was "no part of management or nothing," doc. 27-3 at 15). *See id.* at 13 (reported "walk on the wild side" remark to Tammy, Susan, Mark, Jeff, and Debbie; "I asked them was this going to keep on taking place. I mean, I was told that they were going to refer to Mr. Houston about the situation."), 14 (reported "stick[] something back there" comment to Susan, who purportedly stated that she would talk to Mr. Houston), 15 (reported "jacking off" remark to Debbie Davis), 17 (Mark Little witnessed June 2013 "wouldn't know if [Van Petty] was a man or a woman" remark, 18 (no witnesses to October 2013 "wouldn't know if [Van Petty] was a man or a woman" remark).

The last comment is the only racial slur Pullom reported to management. *Id.* at 20. According to Pullom, "Ms. Coker told me that she talked to Mr. Houston [GBTS's President and owner] and I wouldn't have no more problems out of [Van Petty]." *Id.* at 21. A few months later, on December 4, 2013, Coker discharged Pullom "per Mr. Houston" purportedly because Pullom worked on his personal vehicle at the shop without permission. *Id.* at 22.

## B. Waldrep

Waldrep, who is male, worked for GBTS as a service man from October or November 2012 through August 2013, and later as a heavy line mechanic from June 2014 through September 21, 2014. Doc. 1 at 6. Waldrep claims that Van Petty sexually harassed him during Waldrep's first stint of employment. Allegedly, Van Petty affixed pictures of male genitalia to Waldrep's toolbox twice. Doc. 27-4 at 11. On another occasion, Van Petty purportedly told Waldrep, "pull your britches up, boy, before I stick something in you." *Id.* at 14. Van Petty also stuck an "air hose" inside Waldrep's shirt while threatening to "stick something" in Waldrep. *Id.* Waldrep resigned due to this purported conduct, *id.* at 11, albeit without complaining about this conduct to anyone in management. *See* docs. 27-4 at 11 (claiming he reported the conduct to Mark Little, who did not have the title of "supervisor" "at the time"); 30-11 at 10 (Little's testimony that he was "the same thing [Waldrep] was, a heavy line mechanic," at the time).

Waldrep returned to GBTS in June 2014 after Little, who by then was a shop supervisor, *see* doc. 30-11 at 12, assured Waldrep that he would not have to deal with Van Petty, doc. 27-4 at 13. However, when Waldrep returned, Van Petty was "still in the office in the shop." Doc. 27-4 at 13. On August 28, 2014, after Van Petty directed an "mmm, mmm, mmm" noise at Waldrep, Waldrep reported this incident to GBTS's bookkeeper, Tammy Phillips, and also told Phillips that Van Petty had taped pictures of male genitalia to Waldrep's toolbox during Waldrep's first employment stint. *See* doc. 27-4 at 17.

Sometime after this complaint, Van Petty directed the "mmm, mmm, mmm" sound toward Waldrep again, and Waldrep again complained to Phillips. *Id.* According to Phillips, Waldrep told her also that if GBTS discharged him, he would submit the genitalia pictures to the Equal Employment Opportunity Commission to assist Pullom with his pending harassment case against GBTS. *See* doc. 30-10 at 10. After this conversation, Phillips informed Coker, who was off-site at the time, that Waldrep had threatened the company with disclosure of the pictures. *See* doc. 30-8 at 37. When Coker shared this alleged threat with Houston, Houston instructed Coker to discharge Waldrep immediately. Coker, in turn, conveyed the directive to Little, *id.* at 32, who met with Waldrep and discharged him for "insubordination" for using his cell phone while working on vehicles, doc. 24-4 at 18. Allegedly, Little added that the real reason was

"something about going to Tammy about the pictures that were on [his] toolbox."

*Id.*

## III. ANALYSIS

The analysis is divided into two primary parts. In Section A, because it is a threshold issue that concerns this court's jurisdiction, the court will address plaintiffs' motion for partial summary judgment as to GBTS's affirmative defense that it employed less than 15 individuals and, therefore, was not an "employer" under Title VII. *See* doc. 28. Because the court finds that plaintiffs have established that GBTS is an "employer" under Title VII, in Section B, the court will address GBTS's motion for summary judgment.

### A. Plaintiffs' Motion for Partial Summary Judgment

In its seventh affirmative defense, GBTS states: "These Defendants deny that [GBTS] has the requisite number of employees to be subject to the federal statutory claims made the basis of Plaintiffs' complaint." Doc. 6 at 18. "In the Eleventh Circuit, the issue of whether an employer has fifteen Title VII 'employees' is a 'jurisdictional' question: [A] plaintiff must show that her 'employer' had fifteen or more employees for the requisite period provided under the statute before her Title VII claims can be reached." *Laurie v. Ala. Court of Crim. Appeals*, 256 F.3d 1266, 1271 (11th Cir. 2001) (citation and internal quotation marks omitted). Plaintiffs attempt to make this showing under the

"single employer" or "integrated enterprise theory,"[4] by aggregating the number of W-2 employees at GBTS with those of affiliated entities Greater Little Rock Transportation Services, L.L.C., Gulf Coast Transit Services, L.L.C., and Winston-Salem Yellow Cab, L.L.C. *See* doc. 29.

"The predominant trend in determining whether two businesses should be treated as a single or joint employer under [42 U.S.C.] § 2000e(b) is to apply the standards promulgated by the National Labor Relations Board (NLRB)." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). Based on the NLRB factors — (1) common ownership, (2) common management, (3) interrelation of operations, and (4) common control of labor relations, *id.* — which the court addresses below, plaintiffs have met their burden of showing single or joint employer status.

---

[4] Due to Title VII's liberal interpretation of "employer," "there are instances where the court has looked beyond the nominal independence of an entity and asked whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's 'employer' comes within the coverage of Title VII . . . ." *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1292 (11th Cir. 2016). *See also Lyes*, 166 F.3d at 1341 ("[W]here two ostensibly separate entities are highly integrated with respect to ownership and operations, we may count them together under Title VII.").

Also, plaintiffs seek to demonstrate that the eighty drivers that worked for GBTS were employees, rather than independent contractors. However, because the court finds that GBTS and the related entities constituted a "single employer" or "integrated enterprise," the court will not address this alternative argument. As a result, the motion to strike the affidavit of Ellis Houston, doc. 38, is **MOOT**.

1. Common ownership

There is sufficient evidence to find that GBTS and the other entities had overlapping ownership during the relevant period. Specifically, Houston owned a 60% interest, Martin Zilber owned a 35% interest, and Paige Coker owned a 5% interest in GBTS and Greater Little Rock. Doc. 27-5 at 6, 9. Houston also owned a 34% interest in Gulf Coast Transit, along with Zilber, who owned 32%, and Michael Levine, who owned 34 percent. *Id.* Houston, Zilber, and Levine also owned "similar" percentages in Winston-Salem Yellow Cab. *Id.* at 23–24.

2. Common management

This factor looks to whether the various entities share common officers and directors. *See McCulley v. Allstates Tech. Servs.*, No. 04-0115-WS-B, 2005 U.S. Dist. LEXIS 41550, at \**117–18 (S.D. Ala. June 21, 2005). *See also Harriel v. Dialtone, Inc.*, 179 F. Supp. 2d 1309, 1312 (M.D. Ala. 2001) (a jury could infer common management when same individual "serve[d] as President [of one entity] while also involving himself in the day-to-day aspects of [the other entity]"); *Stockett v. Tolin*, 791 F. Supp. 1536, 1551 (S.D. Fla. 1992) ("that the same persons . . . essentially managed and supervised the different entities, and that the companies had common officers and boards of directors, is evidence of the kind of common management that supports [this] prong of the [integrated enterprise] test"). Relevant here, Houston served as president and/or managing partner of

GBTS, Greater Little Rock Transportation, Gulf Coast Transit, and Winston-Salem Yellow Cab, and served on two- or three-person "Grievance Committees" that addressed personnel issues for each of these entities. Docs. 29 at 22; 27-5 at 12, 15, 17, and 24. *See also* doc. 27-5 at 6, 9, 23–24 (Houston's testimony that he was "managing partner" of GBTS, Little Rock Transportation, Gulf Coast Transit, and Winston-Salem Yellow Cab). Also, GBTS Vice President Paige Coker testified that she spent "50 percent" of her time traveling to manage the Little Rock and Gulf Coast offices. Doc. 30-8 at 8. This evidence is sufficient to find common management.

### 3. Interrelation of operations

The record also supports a finding of an interrelation of operations. Among other things, (1) "all of the calls for each of the market areas . . . were handled through the dispatch center of Greater Little Rock by approximately thirty (30) call takers and dispatchers employed by Greater Little Rock," doc. 29 at 20.[5] *See also* doc. 27-5 at 9; (2) GBTS, Greater Little Rock, and Gulf Coast Transit are advertised jointly as the "Southern Taxi Group." *Id. See McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987) ("The close affiliation

---

[5] GBTS responds that "GBTS reserves no right to and exercises no control over the method and manner in which the Greater Little Rock dispatchers perform their duties. Instead, they are supervised by Greater Little Rock." Doc. 36 at 11. However, GBTS cites no authority to suggest that this affects the analysis. Additionally, as to GBTS's contention that "whether the competing facts are sufficient to satisfy the single employer test is a question of fact for the jury," doc. 36 at 11–12, the court discusses only undisputed facts in its analysis.

of the companies is also evidenced by their advertisement. They market the companies as twins to the public."); (3) Greater Little Rock had the authority to enter into contracts with third parties on behalf of itself and its "affiliated entities," GBTS, Winston-Salem, and Gulf Coast. *See id.* at 21; (4) in 2012, Little Rock entered into a "Non-Disclosure and Restrictive Covenant Agreement" on behalf of itself and its "affiliated entities, including . . . [GBTS], Winston-Salem Yellow Cab LLC, . . . and Gulf Coast Transit Services, LLC . . . ." Doc. 30-5 at 10; (5) although Tammy Phillips' paycheck was issued by GBTS, she served as the controller/bookkeeper for all of the entities. *See* doc. 30-10 at 5–6.[6] *See also McKenzie*, 834 F.2d at 934 (maintenance of books and records at one location for multiple locations and issuance of paychecks for multiple locations from a single location evidences interrelation of operations); (6) Van Petty, an employee of GBTS, installed new cameras and computers in the taxis at Greater Little Rock "fifteen" or "twenty" times, and has also trained staff at the Gulf Coast and Winston-Salem locations,[7] doc. 30-9 at 10–11; (7) the entities shared vehicles, as

---

[6] GBTS counters that, "[t]o the extent any of the other entities utilize personnel or assets belonging to GBTS, or vice versa, the entity providing such a benefit is fairly compensated by the entity receiving the benefit, as an independent contractor . . . ." Doc. 36 at 2. However, GBTS does not present any authority indicating that "leasing" services or assets affects the analysis. Moreover, as plaintiffs note, "despite extensive discovery . . . requesting any such contracts, agreements, or financial records amongst these entities and/or Ellis Houston, none have been produced . . . ." Doc. 39 at 7 n.1. GBTS does not challenge this contention in its response brief, doc. 36.

[7] There is evidence also that the entities may have exchanged employees. *See* doc. 30-1 at 22 (Houston describing Van Petty's transfer to Little Rock as: "[Van Petty] just left

evidenced by GBTS's practice of having its employees transport vans from Birmingham to Biloxi for Gulf Coast's use, *see* doc. 27-3 at 12; and (8) all of the entities share a mailing address — "5804 Oporto Madrid Blvd, Birmingham, Alabama 35210," *see, e.g.*, docs. 30-3 at 1; 30-5 at 1.

4. <u>Common control of labor relations</u>

The final factor "looks at which company has the power to hire and fire employees and control employment practices." *See Guaqueta v. Universal Bevs., L.L.C.*, No. 09-21576-CIV-O'SULLIVAN, 2010 U.S. Dist. LEXIS 69660, at *20 (S.D. Fla. July 13, 2010). *See also Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 727 (N.D. Ala. 1981) ("[T]he 'control' required to meet the test of centralized control of labor relations is not potential control, but rather actual and active control of day-to-day labor practices."). As evidence of shared control of labor relations, plaintiffs point to Houston and Coker's roles on most of the entities' Grievance Committees, and that the various entities operated under the same written "Personnel Policies." *See* doc. 30-1 at 18.

Based on this record, when considering all of the NLRB factors together, the court concludes that GBTS operated as a "single employer" or "integrated enterprise" along with Greater Little Rock Transportation, Gulf Coast Transit, and Winston-Salem Yellow Cab during the relevant time period. Because GBTS and

Birmingham and went to Little Rock. So he moved off of Birmingham's payroll and moved onto Little Rock's payroll.").

these affiliated entities had a combined number of more than 15 employees during the relevant period, *see* docs. 30-3 at 22; 30-4 at 73; 30-1 at 25, this court has jurisdiction over plaintiffs' Title VII claims.

**B. Defendants' Motion for Summary Judgment**

GBTS and Van Petty seek summary judgment as to all claims.

1. Pullom's Race-Based Harassment Claims (Counts I and III)

During Pullom's 19 month employment period, Van Petty subjected Pullom to the following racially offensive comments: (1) that he has "never done a black guy" but might "do a light skinned guy," (2) that slow-driving African-American women are "nappy headed hoes" or "nappy headed bitches," (3) that Pullom needed to go with Van Petty to "where [Pullom's] people [were] at" in the "hood" to repossess taxis, and (4) that Pullom is Coker's "house nigger." Although these alleged comments are offensive, under current law, four comments spread out over 19 months fail to rise to the severe and pervasive level necessary for a hostile environment claim.[8] Moreover, the claim also fails because, when Pullom utilized

---

[8] "Harassment is severe or pervasive for Title VII [and Section 1981] purposes only if it is both subjectively and objectively severe and pervasive." *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 509 (11th Cir. 2000). To evaluate the objective component, courts look to the "(1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999). In addition to the infrequent nature of the alleged comments, most, if not all, of the other factors also weigh against Pullom — i.e. although some of the remarks were humiliating, none could be reasonably interpreted as "physically threatening," and Pullom does not claim that the remarks interfered with his job performance. *See id.* at 1248.

the complaint procedure, the harassment stopped. *See* doc. 27-3 at 21–22. *See also Adler v. Wal-Mart Stores*, 144 F.3d 644, 676 (10th Cir. 1998) ("A stoppage of harassment shows effectiveness, which in turn evidences reasonable calculation [to end the harassment].").  Therefore, GBTS's motion as to Pullom's race harassment claims is due to be granted.

### 2.    Pullom's Title VII Sexual Harassment Claim (Count V)

Although Pullom only recounts four specific incidents in his deposition,[9] he testified also that Van Petty "ma[de] some sexual advance" toward him "[j]ust about" every time Pullom saw him, and that on some days, the advances occurred "multiple times in a day" if Pullom was "at the shop or around [Van Petty]."  Doc. 27-3 at 11.  Giving Pullom all reasonable inferences, the constant harassment he endured rises to the severe and pervasive level necessary to constitute an actionable hostile work environment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) ("three to four times a day" sufficiently frequent to constitute an objectively hostile work environment).

Because Van Petty was a supervisor, GBTS can avoid liability if it can plead the affirmative defense outlined in *Faragher v. City of Boca Raton*, 524 U.S. 775

---

[9] Pullom identifies the following incidents of sex-based harassment:  (1) Van Petty's query if Pullom would like to "take a walk on the wild side," doc. 27-3 at 13; (2) Van Petty's statement that Pullom should pull up his pants or Van Petty would "stick something" in him, *id.* at 14; (3) Van Petty purportedly offering to help Pullom "jack[] off" in the restroom, *id.*; and (4) Van Petty purportedly telling Pullom, in the summer of 2013 and October 2013, that, in the dark, Pullom would not know if Van Petty was a "man or a woman," *id.* at 17–18.

(1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) — i.e., assuming that there was no tangible employment action, that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and that Pullom unreasonably failed to take advantage of any preventative or corrective opportunities GBTS provided or to avoid harm otherwise. *See Faragher*, 524 U.S. at 807. Relevant here, although an employer may show "reasonable care" through the dissemination of a sexual harassment policy,[10] — and GBTS had such a policy, doc. 30-3 at 20, neither Pullom nor Coker, who typically "went through the handbook" with new employees, could recall whether Pullom received the handbook that contained the policy, *see* docs. 27-3 at 29; 30-8 at 17. *See Faragher*, 524 U.S. at 808 (defendant employer unable to utilize the affirmative defense because it "had entirely failed to disseminate its policy against sexual harassment among [its] . . . employees"). Moreover, even if Pullom received the handbook, an issue of fact exists regarding whether GBTS acted diligently to enforce the policy in light of Pullom's testimony that Houston, GBTS's President and CEO, stated, in an open meeting during the spring or summer of 2013, that "everyone in [the] shop would be let go before Keith Van Petty would be let go, so there wasn't [any] need to complain anymore." *See* doc.

---

[10] *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997) ("Where there exists an effective [sexual harassment policy] . . . we conclude that the employer has made reasonably diligent efforts to learn and know of the conduct of its employees.").

27-3 at 20. *See also id.* at 25 ("Mr. Houston said before he fired Keith Van Petty he would get rid of everybody in the shop and it would be just him and Keith Van Petty."). Therefore, GBTS's motion as to Pullom's sex harassment claim is due to be denied.

### 3. Pullom's Retaliation Claims (Counts II, IV, and VI)[11]

Pullom alleges next that GBTS discharged him in retaliation for complaining about Van Petty's conduct. Doc. 1 at 13, 17, 21. To prove a causal connection between his discharge and the complaints, Pullom relies solely on the purported temporal proximity between his complaint to Coker about the racial slur and his discharge. *See* doc. 34 at 37. However, "temporal proximity, without more, must be *very close* in order to satisfy the causation requirement." *Jones v. Gulf Coast Health Care of Del., L.L.C.,* 854 F.3d 1261, 1271–72 (11th Cir. 2017) (emphasis added). Here, GBTS discharged Pullom on December 4, 2013, and his only complaint to management (Coker) about Van Petty's race-based remarks occurred "maybe some months before [Pullom] was terminated." Doc. 27-3 at 21. A three to four month gap between the protected conduct and an adverse employment

---

[11] In Count VI, Pullom pleads a claim of retaliation for opposing sexual harassment. The last time Pullom complained to any person at GBTS about sexual harassment was to Debbie Davis, whom Pullom described as a non-manager, on some unspecified date between July 2012 and the "summer" of 2013, *see* doc. 27-3 at 13–17. Thus, Pullom cannot establish a *prima facie* case for sex harassment retaliation due to the lack of close temporal proximity between this alleged complaint and his December 2013 discharge. This claim fails also for the same reasons as the race harassment retaliation claim, i.e., that Pullom fails to establish causation or to demonstrate pretext.

action is too remote to establish causation.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  Therefore, because Pullom fails to show a sufficiently close time span between his complaint and his discharge, and Pullom does not present any other evidence of causation, his *prima facie* case fails.

Alternatively, even if Pullom can make a *prima facie* case, his retaliation claims fail because he cannot rebut GBTS's articulated reason for his discharge — i.e., that "Pullom was terminated for working on his personal vehicle in the GBTS shop on a Saturday without permission from management."  Doc. 27 at 31.  Pullom acknowledges that it was "not appropriate" to work on his personal vehicle without "permission from [a] supervisor."  Doc. 27-3 at 23.  However, Pullom contends that he complied with the rules by obtaining permission from Mark Little.  *Id.* Unfortunately for Pullom, when Houston asked Little about the incident, Little reported that he "didn't [give Pullom permission]."[12]  Doc. 27-5 at 55.  *See also id.* (Houston's testimony that "[w]e did verify that nobody told [Pullom] that he had the authority to make sure all that was covered before I made the decision").  Absent evidence to show that Houston acted unreasonably in choosing to believe

---

[12] Little testified also that Pullom did not have permission:  "As far as I know, that's what brought it all up, is he done it without permission.  And if you don't have permission, you're not allowed in the shop unless you're there working on the clock."  Doc. 30-11 at 22.  *See also id.* at 14 (Q:  "What did you find out Monday morning [the 30th]?"; A:  "Well, there was a big mess of muffler stuff all gutted out in the floor.  And I think that Mr. Van Petty asked what happened there or something another and Jeff told him.  And then it went from there to Mr. Houston.  And it stood for grounds as being terminated because he [Pullom] didn't get authorization.").

Little's report that Pullom worked in the shop without permission, even if Little, in fact, lied to Houston, Pullom's retaliation claims fail.[13] *See EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1176 (11th Cir. 2000) ("[The employee] could properly be discharged based on [the employer's] good faith belief that she [engaged in wrongdoing]."); *Morgan v. Orange Cnty.*, 477 F. App'x 625, 628 (11th Cir. 2012) ("[I]f the employer acted on an honestly held belief that the employee engaged in misconduct, even if it was mistaken, no retaliation exists.") (citation omitted).

4. Waldrep's Title VII Retaliation Claim (Count X)

Waldrep alleges that GBTS discharged him in retaliation for his complaints to Tammy Phillips about the pictures of male genitalia Van Petty left on Waldrep's toolbox and for stating that he would assist Pullom with his claims against GBTS if GBTS discharged Waldrep. *See* docs. 1 at 29; 34 at 33–35. In support of his claim, Waldrep contends that although Mark Little initially cited "insubordination" as the reason for the discharge, after Waldrep pressed Little about "what [he] [was]

---

[13] Pullom also asserts, as evidence of pretext, that he had "worked on his personal car at GBTS twice before, for which Houston was not aware Pullom had sought permission, and he was not terminated for either instance"; that "GBTS employees could work on their personal cars and neither Coker nor Houston were aware of any employee ever being denied the ability to do so"; that "Houston testified he probably would have let Pullom work on his car"; that "other employees such as Jeff Johnson worked on their cars at GBTS as long as Van Petty was monitoring"; and "per the EEOC onsite interviews it was not until after Pullom was fired that GBTS employees were told they could no longer perform work on their personal vehicles at the shop." Doc. 34 at 40. None of these contentions meet "head on" and "rebut" Houston's testimony that he believed that Pullom acted without authorization. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Moreover, Pullom testified that he knew he needed authorization to use the GBTS shop to work on his personal car. *See* doc. 27-3 at 23.

actually being fired for," Little added that "you went to Tammy [Phillips] about the pictures of the tool —that Keith put on your tool box . . . ." Doc. 27-4 at 18. Although GBTS asserts that "the decision to terminate Waldrep was made before he allegedly complained about any alleged sexual harassment," doc. 27 at 30, and that it discharged Waldrep for legitimate reasons, in light of the direct evidence of retaliation Waldrep presents, it is for a trier of fact to weigh the evidence and make credibility determinations, and ultimately decide whether GBTS discharged Waldrep for retaliatory reasons or for alleged insubordination. *See Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (direct evidence of retaliation when "actions or statements of an employer reflect[] a . . . retaliatory attitude correlating to the discrimination . . . complained of by the employee"). Accordingly, GBTS's motion as to Waldrep's retaliation claim is due to be denied.

5. Waldrep's State Law Assault and Battery Claims (Count XIII)

Waldrep also pleads an assault and battery claim for the incident where Van Petty placed an air hose under Waldrep's shirt while threatening to "stick something in" Waldrep. *See* docs. 1 at 7; 27-4 at 14. Based on the court's reading of Alabama law, contrary to defendants' contention, Waldrep does not have to show that the touching was "rude or angry" to plead a valid claim. *See* doc. 27 at 38. Rather, Waldrep must show only that the touching was "conducted in a harmful or offensive manner." *Ex parte Atmore Community Hosp.*, 719 So. 2d

1190, 1193 (Ala. 1998). Because a reasonable person could find that the touching was offensive and not mere horseplay, Van Petty's motion as to the assault and battery claim is due to be denied.

GBTS is due summary judgment on the claim against it. To hold GBTS liable for Van Petty's battery, Waldrep must show that GBTS ratified or condoned Van Petty's conduct. Ratification requires that Waldrep prove that "the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation." *Ex parte Atmore Community Hosp.*, 719 So. 2d at 1195. Waldrep has failed to establish that GBTS had actual knowledge of Van Petty's tortious conduct and failed to prevent it from recurring. Relevant here, Waldrep testified that he never reported Van Petty to anyone in management during his first employment stint when this incident occurred. *See* doc. 27-4 at 15 (Q: "[D]id you make a complaint to anybody in management about —"; A: "No, sir, I never talked to anybody but Mark [Little][14] thinking Mark would handle it, and Keith his self."). Moreover, Waldrep does not allege that Van Petty touched him again following the air hose incident and, thus, no basis exists to find that

---

[14] Waldrep complained to Mark Little about nude photos after Waldrep came back to work for GBTS. Doc. 27-4 at 11. However, the air hose incident preceded this complaint.

GBTS ratified the battery. For these reasons, GBTS's motion as to the assault and battery claim is due to be granted.

6. <u>The State Law Negligent or Wanton Supervision, Training, and Retention Claims (Counts IX and XIV)</u>

In Count IX, Pullom alleges that GBTS "negligently and/or wantonly failed to adequately supervise and train and negligently and/or wantonly retained Petty, Phillips, Little, Coker, and/or other members of management," which "proximately caused Petty's sexual harassment of [Pullom], racial harassment of [Pullom], unlawful retaliation against [Pullom], invasion of [Pullom's] privacy, and acts of outrage against [Pullom]." Doc. 1 at 27. Waldrep likewise alleges in Count XIV that GBTS "negligently and/or wantonly failed to adequately supervise and train and negligently and/or wantonly retained Petty, Phillips, Little, Coker, and/or other members of management," which "proximately caused the unlawful retaliation against [Waldrep], invasion of [Waldrep's] privacy, acts of outrage against [Waldrep], and assault and battery of [Waldrep]." *Id.* at 37.[15] Both claims fail for the reasons below.

As an initial matter, because "a party alleging negligent supervision . . . must prove the underlying wrongful conduct," *Univ. Fed. Credit Union v. Grayson*, 878

---

[15] Under Alabama law, an employer may be liable for negligent training, supervision, and/or retention when the employer had "notice or knowledge" of his servant's "incompetency" or "would have learned" about it "had he exercised due and proper diligence." *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983).

So. 2d 280, 291 (Ala. 2003), and plaintiffs have withdrawn their invasion of privacy and outrage claims, *see* doc. 34 at 41 n.22, the negligent and/or wanton supervision, training, and retention claims based on these torts fail. Thus, although it is an onerous task to discern precisely what plaintiffs are alleging in Counts IX and XIV, *see* doc. 1 at 27, 37 (referencing the factual predicate for these claims: "[a]s set out in detail above"),[16] it appears the court is left to decide whether GBTS can be liable for its servants' "incompetency" with regard to Van Petty's sexual and racial harassment of Pullom and assault and battery against Waldrep, and Little, Phillips, and Coker negligently or wantonly processing (or failing to process) plaintiffs' complaints about Van Petty and purportedly retaliating against plaintiffs by discharging them.

Because, as stated above, plaintiffs must first prove the underlying conduct by GBTS's servants, *see Grayson*, 878 So. 2d at 291, and the court previously determined that Pullom's racial harassment and retaliation claims fail, these alleged torts cannot serve as a basis for Pullom's negligent and/or wanton supervision, training, and retention claim against GBTS. As to the sexual harassment claim, although "the manner in which a sexual-harassment complaint is handled when sexual harassment has . . . occurred could form the basis for a claim

_____

[16] *Byrne v. Nezhat*, 261 F.3d 1075, 1129 (11th Cir. 2001) ("shotgun" pleading is one which "each count incorporates every antecedent allegation by reference); *Anderson v. District Board of Trustees of Central Florida Community College*, 77 F.3d 364, 366 (11th Cir. 1996) ("[I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.")

for negligent or wanton supervision," *Stevenson v. Precision Std., Inc.*, 762 So. 2d 820, 825 (Ala. 1999), Pullom last complained about Van Petty's sexual harassment to a "coworker," Debbie Davis, at some unspecified time between July 2012 and the "summer" of 2013, *see* doc. 27-3 at 13–17. In other words, at best, the latest date Pullom complained was August 2013, which was more than two years prior to the filing of the complaint.[17] As such, Pullom's negligence and/or wantonness claims related to Little, Phillips, and Coker's purported incompetency fails. Moreover, because "[u]nder Alabama law, an independent cause of action for sexual harassment does not exist, . . . the alleged sexual harassment alone cannot be the underlying tort necessary for plaintiff's hiring, training, supervision, and retention claim," *Andazola v. Logan's Roadhouse, Inc.*, 871 F. Supp. 2d 1186, 1225 (N.D. Ala. 2012) (citing *Stevenson*, 762 So. 2d at 824–25), GBTS also cannot be held liable on a negligence and/or wantonness claim for Van Petty's sexual harassment.

---

[17] There is no evidence that Pullom complained to Phillips, Coker, or Little about sexual harassment within the limitations period, so any claim based upon these individuals' alleged incompetency in processing such complaints is time-barred. Pullom counters that "[t]he manner in which a . . . harassment complaint is handled when . . . harassment has, in fact, occurred could form the basis for a claim for negligent or wanton supervision." Doc. 34 at 42–43 (quoting *Stevenson v. Precision Std., Inc.*, 762 So. 2d 820, 825 (Ala. 1999)). In other words, Pullom asserts that his claims are timely because the "manner in which" GBTS "handled" his complaints was through his discharge, *see* doc. 34 at 43, which is within the two-year limitations period. These contentions are unavailing because Pullom has failed to prove that his discharge was connected to his complaints about alleged harassment. *See supra* Part III.B.3.

Waldrep's negligence and/or wantonness claims also fail. First, Title VII retaliation cannot serve as an underlying tort for an Alabama negligent and/or wanton training, supervision, and retention claim. *See Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (citing *Stevenson*, 762 So. 2d at 824) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a *common-law, Alabama tort*.") (emphasis added); *see also Trainer v. Supreme Bev. Co.*, No. 2:11-cv-00057-WMA, 2013 U.S. Dist. LEXIS 3911, at *19 (N.D. Ala. Jan. 10, 2013) ("[T]he underlying wrongful conduct must be a common-law, Alabama tort committed by the employee, not [] a federal cause of action such as Title VII.") (internal quotation marks omitted). Second, the negligence or wantonness claim related to the assault and battery also fails, because it is time-barred. More specifically, the assault and battery occurred sometime shortly after Waldrep began his first employment stint with GBTS, and Waldrep never reported this incident to anyone in management. *See* doc. 27-4 at 14–15.[18]

For these reasons, Pullom's and Waldrep's negligence and/or wantonness claims are due to be dismissed as untimely and/or on the merits.

---

[18] *See also* docs. 27-4 at 14 (Q: "Did you complain to anybody in management about any of the things that you were just telling me about?"; A: "No."); 30-11 at 10 (Little's testimony that, at the time Van Petty was sexually harassing Waldrep, Little "wasn't a manager at that time," and it "wasn't his responsibility to report it to management"); *id.* ("I was just the same thing [Waldrep] was, a heavy line mechanic").

## IV.   CONCLUSION AND ORDER

In accordance with the foregoing, plaintiffs' partial motion for summary judgment, doc. 28, is **GRANTED**.  Defendants' motion for summary judgment, doc. 27, is **GRANTED** as to Pullom's race-based harassment claims (Counts I and III), retaliation claims (Counts II, IV, and VI), and negligence and/or wantonness claims (Count IX), and Waldrep's assault and battery claim against GBTS (Count XIII) and negligence and/or wantonness claims (Count XIV), and these claims are **DISMISSED WITH PREJUDICE**.  Defendants' motion is **DENIED** as to Pullom's sex harassment claim (Count V), and Waldrep's retaliation claim (Count X) and assault and battery claim against Van Petty (Count XIII).

**DONE** the 9th day of August, 2017.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE